### LEE HENDERSON v. THE STATE.

No. 4534. Decided January 20, 1909.

**Aggravated Assault—Deadly Weapon—Pocket-Knife.**

Where the allegation was that an aggravated assault was committed by means of a deadly weapon, and the evidence showed that the defendant acted in self-defense by using an ordinary pocket-knife, but did not show that it was a deadly weapon in the manner in which it was used, a conviction for aggravated assault was not sustained.

Appeal from the County Court of Tarrant. Tried below before the Hon. John L. Terrell.

Appeal from a conviction of aggravated assault; penalty, three months confinement in the county jail.

The opinion states the case.

No brief on file for appellant.

*F. J. McCord*, Assistant Attorney-General, for the State.

DAVIDSON, PRESIDING JUDGE.—Appellant was allotted three months in the county jail on a charge of aggravated assault.

The contention is, the want of sufficient evidence to support the conviction. The State's case is made by the witnesses Henry Fussell, Pete Smith and W. H. Smith. Fussell testified that he was a stu-

dent of the Polytechnic College, and was seventeen years of age. That he saw the defendant between eight and nine o'clock on the evening of August 7, 1908; saw him board the street car at its termination, near the Polytechnic College. There were ten or twelve students near the car when he boarded it, chunking each other with water melon rinds. That appellant ran and caught the car just as it started. Pete Smith was one of the boys in the crowd. The car left where the boys were standing, and after going a block and a half stopped in front of a drugstore. The witness proceeded to where the car had stopped and got on the front end of it. He did not run fast but hurried along to get to the car before it started. He was not a passenger on the car, nor did he intend to become such; merely intended to ride down to the curve of the track. When he got to the car the motorman and conductor were not on same, but in a drugstore nearby. This witness stepped on the front end of the car and Pete Smith proceeded to get on the rear end, and another one of the boys was by the side of the car. Immediately after Smith went in the car he and appellant became engaged in a difficulty and were fighting in the aisle of the car. Smith knocked appellant down between the seats. This witness then went in the car door from the front and approached Smith and appellant, and states that he went there for the purpose of separating them, and was in the act of doing so, when appellant raised from between the seats, where he had been knocked down by Smith, and cut him with a pocket-knife in the right shoulder. The knife was an ordinary pocket-knife with a blade about three inches long. The witness went away to a drugstore for the purpose of ascertaining the nature of his injuries.

Pete Smith testified that he was also a student of the Polytechnic College. That he met appellant near the end of the carline and had some conversation with him about where he was going to call on a negro servant girl—appellant being a negro and the College boys being white. Appellant went on his way, and the witness saw no more of him until about two and one half hours later, when several of the college boys (including the witness Smith) were playing and chunking watermelon rinds at the end of the carline, when appellant ran past them and caught the car which was in the act of leaving. He says they did not throw at the negro, but the witness recognized him as being the same negro he had previously talked to earlier in the evening. He says: "I sorter had it in for him, and when the car stopped about a block from where we were, I started out with a piece of watermelon rind in my hand to overtake the car, while it was standing still, boarded the same, and rubbed the watermelon rind on the negro's face to repay him for his impudence earlier in the evening. When I left the end of the carline and started for the car, I, of course, had to hurry, in order to overtake the same before it started up again. I did not notice who, if anyone, went with

me; but at the time I started there were several boys at the end of
the car line.   When I overtook the street car the motorman and
conductor were not aboard the same, but were in the drugstore near-
by.   When I boarded the rear end of the car, I saw Henry Fussell
getting on the front.   There might have been some other boys
present, but I paid no attention to them.   As soon as I boarded the
rear end of the car, I went immediately on the inside of the same,
and approached defendant, where he was sitting in the rear of the
car, he being the only passenger in the car.   As quick as I got to
where defendant was I proceeded to swipe him in the face with a
watermelon rind; then a scuffle ensued, between defendant and I,
in which I struck the defendant one blow with my fist that I am
positive of; he and I then going between the seats of the car, defend-
ant arising from sorter on his side from between the seats and cut-
ting me with his pocket knife.   As soon as this happened I left the
car."   The motorman, Smith, testified that he held that position on
the street car line, and had so been employed for about eleven months.
That he saw appellant and some of the college boys get in a difficulty
or what the witness calls a "mixup."   The car had just left the end
of the line and ran about a block and a half to a drugstore, and
the witness got off to get a drink of water and a watermelon.   While
in the drugstore they left the car standing immediately in front of
the store, and about the time they returned to the car he noticed
Henry Fussell in the act of boarding the front end of the car, and
Pete Smith boarding the rear of the car.   He also noticed one or
two of the college boys at the side of the car.   Pete Smith went
in the car, where defendant was sitting, and the first thing that he
knew, they were in a fight.   He saw Pete Smith knock the negro
down between the seats, but later on it appeared as if the negro was
getting the best of the fight.   Henry Fussell then went in the car
to where the fight was going on.   He says none of the college boys
were passengers on the car that trip; defendant being the only pas-
senger on the car at said time.   That when defendant got his knife
out the boys left the car hurriedly; defendant remaining in the
car until taken off into the drugstore by the conductor.   The defend-
ant's hand, in which he held his knife, was bleeding.   He says Fussell
seems to have been separating them, and made no effort so far as
he could see to strike appellant.   He took Fussell in the drugstore
to have his wound given attention.

    The defendant testified that he was twenty years of age, and had
been working at the packing house for three months.   Theretofore
he had been working on his father's farm near Smithville, Texas,
where he was raised; and that this was the first offense he had ever
been charged with in his life; never had even been a witness in
court before.   That on the evening he is charged with committing
the assault upon Henry Fussell he went to the Polytechnic College,
about six o'clock in the evening, for the purpose of visiting a negro

servant girl who lived about two blocks from the end of the car
line. That when he got off the car, he made inquiry of the witness
Pete Smith as to the direction he should take in going to the girl's
house. In that conversation Pete Smith remarked that he (appel-
lant) was not yet a man and not old enough to go to see the girls.
Appellant says: "I rubbed my face as if though I had beard, looked
at him, and remarked that he appeared to be some man himself,
he having a fuzzy growth upon his face." Appellant then went on
to the house of the negro servant, and stayed until about 8 or 8:30
o'clock, and returned to the end of the car line, and when he got
nearly to the same, he passed ten or twelve college boys; that just
as he passed them they began to throw rocks at him (appellant),
and he ran to get to the car. Just as he reached the rear end of the
car a rock struck him on his right shin-bone. The boys came up
to the rear of the car, but did not get on as the car was then starting.
He says he was the only passenger at that time and took a rear
seat. That after running a block or so, the car stopped and the
motorman and conductor both got off and left appellant alone in the
car. Shortly afterward he says he saw the white boys coming, some
across the school grounds and some down the car track; some of
them got on in front and some of them behind, and some of them
stood on the outside of the car near the windows. The boy they
call Pete Smith came in from the rear door and immediately jumped
on appellant, where he was sitting, knocking him down between the
car seats. He says he did not know where Henry Fussell came
from, nor does he remember seeing him. There were several boys
in the car by the time he was knocked down between the seats by
Smith. He says: "It looked to me like there was a whole dozen
of them, and that they were going to mob me. I was sorter lying
on my back, and sorter on my side, while the boys were on me. I
got somebody's finger in my mouth and I bit it as hard as I could.
About this time, the boys all left the car, and I got up from
between the seats and remained on the car until taken off by the
motorman and conductor, who took me to the drugstore and phoned
for the sheriff, who came and arrested me. This is the case on the
facts.

The complaint and information charge the assault to be aggra-
vated, because the assault was made with a knife, which was then
and there a deadly weapon. The only evidence in the record with
regard to the character of the knife is stated by Henry Fussell—
that it was an ordinary pocketknife with a blade about three inches
long. A pocketknife of that description is not *per se* a deadly
weapon, and there is no evidence, further than that stated, indi-
cating the nature and character of it as to whether it was deadly or
not. Under the decisions of this court, this is not sufficient evi-
dence to show that the weapon was of a deadly character. We are
of opinion this evidence does not sustain the conviction of assault

from that standpoint. Where the allegation is that an aggravated assault was committed by means of a deadly weapon, the evidence must show that beyond a reasonable doubt, in order to sustain a conviction on that ground. We are further of opinion that the evidence does not show an aggravated assault. There is no question, even from the State's standpoint, that Pete Smith made an assault upon appellant on the street car, and followed him for a block and a half in order to do so; that he assaulted him first by rubbing watermelon rind in his face, provoked the difficulty, and then knocked him down between the seats of the car, and that Henry Fussell joined, in what the witness called a "mixup," and in the general row received a cut in the right shoulder. There are several very strong elements, even from the State's standpoint, of a pure case of self-defense; and under no view of the facts, as we understand, even from the State's testimony, is there a case of aggravated assault. In fact, there is no case of assault justifying a conviction, unless it would arise from the fact that appellant may have used more force than was necessary in repelling the assault. The writer does not believe that appellant should be convicted for any character of assault; that he had a right to defend himself under the circumstances, and that under the facts he used no more force than was necessary to rid himself of his assailant, and that the assaults were continued upon him until he did use his knife.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*